## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| KENNETH BECKER, WILLIAM YOUNGER, MARK RUSHING, WILLIAM BOYD, RICHARD GALAUSKI, FRANK OWEN, NATHAN BUTLER, JAMES JARVAIS and ANDY COON, individually and on behalf of others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) Civil Action No. |
| v. | )<br>) |
| MARATHON PETROLEUM COMPANY LLC, MURPHY OIL CORPORATION, THE PANTRY, INC., SPEEDWAY SUPERAMERICA, LLC and WILCO HESS LLC, | )<br>)<br>)<br>) CLASS ACTION COMPLAINT<br>)<br>) JURY TRIAL DEMANDED<br>) |
| Defendants. | )<br>) |

### COMPLAINT

Plaintiffs Kenneth Becker, William Younger, Mark Rushing, William Boyd, Richard Galauski, Frank Owen, Nathan Butler, James Jarvais and Andy Coon, individually and on behalf of others similarly situated, through their attorneys, for their Complaint against Defendants Marathon Petroleum Company LLC ("Marathon"), Murphy Oil Corporation ("Murphy Oil"), The Pantry, Inc. ("The Pantry"), Speedway SuperAmerica LLC ("Speedway") and Wilco Hess LLC ("WilcoHess"), state as follows:

### NATURE OF CASE

1.      Plaintiffs bring this class action complaint individually and on behalf of persons who purchased motor fuel in the States of Alabama, Arizona, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas and Virginia when the motor fuel at the time of sale to Plaintiffs or class members was greater than 60 degrees

Fahrenheit. During each such sale of "hot" motor fuel, the Defendants delivered a smaller quantity of motor fuel to Plaintiffs or class members than the amount for which Defendants charged them because the Defendants measured the amount of motor fuel they delivered in non-standard "gallons" which contained variable quantities of motor fuel depending on the temperature of the motor fuel. The Defendants continue these practices which are injurious to Plaintiffs and class members.

## THE PLAINTIFFS

2.      Plaintiff Kenneth Becker is a resident of Montgomery, Texas.  He is a citizen of Texas and is engaged in business as a truck driver.  Plaintiff Becker purchased hot diesel fuel in connection with his business from Defendant Marathon in the State of Texas.

3.      Plaintiff William Younger is a resident of Kathleen, Florida.  He is a citizen of Florida and is engaged in business as a truck driver.  Plaintiff Younger purchased hot diesel fuel in connection with his business from Defendant WilcoHess in the States of South Carolina and North Carolina.  Plaintiff Younger purchased hot gasoline fuel from Defendant WilcoHess in the State of North Carolina.

4.      Plaintiff Mark Rushing is a resident of Spearville, Louisiana.  He is a citizen of Louisiana and is engaged in business as a truck driver.  Plaintiff Rushing purchased hot diesel fuel in connection with his business from Defendant WilcoHess in the States of North Carolina and South Carolina.

5.      Plaintiff William Boyd is a resident of Mount Pleasant, South Carolina.  He is a citizen of South Carolina and is engaged in business as a truck driver.  Plaintiff Boyd purchased hot diesel fuel in connection with his business from Defendants Marathon, Wilco Hess and The

Pantry in the following states: North Carolina, South Carolina, Texas and Virginia. Plaintiff Boyd purchased hot gasoline fuel from Defendant Speedway in the State of Arizona.

6. Plaintiff Richard Galauski is a resident of Howell, New Jersey. He is a citizen of New Jersey and is engaged in business as a truck driver and also owns and operates chartered boats. Plaintiff Galauski purchased hot diesel fuel in connection with his business from Defendants Speedway and WilcoHess in the State of Florida.

7. Plaintiff Frank Owen is a resident of Bristol, Tennessee. He is a citizen of Tennessee and is engaged in business as a truck driver. Plaintiff Owen purchased hot diesel fuel in connection with his business from Defendant WilcoHess in the States of North Carolina, South Carolina and Virginia.

8. Plaintiff Nathan Butler is a resident of Oakland Park, Florida. Butler is a Florida citizen. Plaintiff Butler purchased hot gasoline fuel for personal, family or household use from Defendants Marathon, Speedway and WilcoHess in the State of Florida.

9. Plaintiff James Jarvais is a citizen of Kansas and is engaged in business as a truck driver. Plaintiff Jarvais purchased hot diesel fuel in connection with his business from Defendant Murphy Oil in Texas and Oklahoma.

10. Plaintiff Andy Coon is a citizen of Louisiana and is engaged in business as a truck driver. Plaintiff Coon purchased hot diesel fuel in connection with his business from Murphy Oil in the States of Louisiana, Mississippi, Georgia, Alabama and Tennessee.

## THE DEFENDANTS

11. Defendant Marathon Petroleum Company LLC is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Findlay, Ohio.

12. Defendant Murphy Oil Corporation is incorporated under the laws of the State of Delaware with its principal place of business in El Dorado, Arkansas.

13. Defendant The Pantry, Inc. d/b/a Kangaroo Express is incorporated under the laws of the State of Delaware with its principal place of business in Raleigh, North Carolina.

14. Defendant Speedway SuperAmerica LLC is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Enon, Ohio.

15. Defendant WilcoHess LLC is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Winston-Salem, North Carolina.

## JURISDICTION AND VENUE

16. Minimal diversity of citizenship exists between the parties.

17. The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

18. This Court therefore has jurisdiction over this class action under 28 U.S.C. § 1332(d)(1).

19. Venue is proper in this Court under 28 U.S.C. §1391 (a) (1).

## FACTUAL BACKGROUND

### *Motor Fuels Are Purchased for the Energy They Provide*

20.     The burning of motor fuel provides the energy harnessed by internal combustion, diesel, rotary and jet engines that are used to power automobiles, trucks, trains, planes, boats, motorcycles and other engine-powered devices such as lawn mowers and generators.

21.     When Plaintiffs and class members buy motor fuel, they are buying energy.

22.     The energy content of motor fuel is expressed and measured in terms of British Thermal Units ("BTU").

4

*The Physical Properties of Motor Fuel*

23.    Motor fuels are petroleum distillate liquids, and their volumes (i.e., the amount of space they occupy) expand and contract as a result of changes in their temperatures even though the actual amount of the fuel remains unchanged.

24.    As the temperature of motor fuel increases, the fuel expands because its molecules move further apart making the motor fuel less dense, and, as a result, the same quantity of fuel at the higher temperature takes up a greater space (i.e., a greater volume).  As the temperature of motor fuel decreases, the fuel contracts or decreases because its molecules move closer together making the motor fuel denser, and, as a result, the same quantity of fuel at the lower temperature takes up a smaller space (i.e., a smaller volume).

25.    Thus, for instance, one U.S. petroleum gallon of gasoline at 60 degrees Fahrenheit has a volume of 231 cubic inches, but the same quantity of gasoline at 75 degrees Fahrenheit has a volume of 233.39085 cubic inches, and the same quantity of gasoline at 90 degrees Fahrenheit has a volume of 235.7817 cubic inches.

26.    Defined volumetrically alone a "gallon" of liquid equals a volume of 231 cubic inches.

27.    Due to the physical properties of motor fuel described above, however, the amount of motor fuel which fills a 231 cubic inch space varies with the temperature of the motor fuel.

28.    In other words, a "gallon" (defined volumetrically without reference to temperature) of motor fuel at any given temperature does not contain an equivalent amount of motor fuel as a "gallon" (defined volumetrically without reference to temperature) of motor fuel at a different temperature.

29.    Thus, a "gallon" defined volumetrically without reference to temperature is not a standard unit of measure.

5

30.    Because a "gallon" defined volumetrically without reference to temperature is not a standard unit of measure, a "gallon" of motor fuel as that term is used in the petroleum industry is <u>not</u> defined volumetrically without reference to the temperature of the motor fuel.

31.    A standard "gallon" unit of motor fuel as defined by usage of trade in the petroleum industry is defined, from the refinery to the retailer, volumetrically with reference to temperature.

32.    Specifically, a "gallon" of motor fuel in the petroleum industry means that amount of motor fuel which occupies 231 cubic inches when its temperature is 60 degrees Fahrenheit.

### Sales of Commodities at a Price Per Unit Means or Implies Fungible Units

33.    Many commodities are sold in variable quantities.

34.    When commodities are sold in variable quantities, they are typically sold at a specified price per standard unit of measure.

35.    Sales of commodities at a specified price per standard unit of measure means or implies, unless otherwise stated, that standard units of a particular kind or grade of the commodity are fungible or, in other words, that each such unit is freely interchangeable with any other such unit of that same kind or grade of the commodity.

36.    Trading of such fungible commodities at a specified price per standard unit of measure brings consistency, predictability and uniformity to transactions in that commodity.

37.    A standard unit of measure is one which has a recognized and permanent value, such that the amount of any given commodity contained in a standard unit of that commodity does not vary and is always the same.

38.    The price of a fungible commodity in a given transaction would have little if any relevance or meaning beyond that specific transaction if the price were not expressed in terms of a price per standard unit because market participants would have no reliable means of comparing

the costs and benefits of any given transaction for that commodity with any other transaction for the commodity without a common understanding of the actual amount of the commodity being sold for a given price.

39.     For instance, using a standard unit of measurement enables merchants to standardize their product pricing, enabling them to deliver equal amounts of a commodity at uniform prices. It also enables merchants to compare their own prices with those of their competitors, in turn enabling merchants to determine whether their pricing is competitive.

40.     The practice similarly enables buyers to compare pricing of various merchants, as well as to gauge from transaction to transaction whether they are paying more, less or the same for the commodity.

41.     For these reasons, trading of fungible commodities at a specified price per standard unit of measure has long been a standard commercial practice.

42.     In addition, for these same reasons, the expression of a sale of a commodity in terms of a specified price per standard unit of measure has come to mean or imply that such units are fungible (which is to say freely interchangeable).

43.     Motor fuel is a fungible commodity sold and purchased in variable quantities.

44.     At the retail level, Defendants advertise and sell motor fuel at a specified price per a purportedly standard unit of measure expressed in "gallons" without expressly defining "gallons."

### The Interdependence of Price, Volume and Temperature

45.     The cost of motor fuel acquired in a purchase of non-temperature adjusted motor fuel is a function of three corresponding, quantifiable and interdependent variables: price, volume and temperature.

46.     These three variables are interdependent such that for any given change in the temperature of each unit delivered, there exists a corresponding change in price per unit delivered or in the value (and thus the appropriate price) per unit delivered.

47.     By way of example, with respect to the sale of one volumetric gallon of gasoline at 60 degrees Fahrenheit priced at $2.98, a temperature increase of 15 degrees Fahrenheit has exactly the same effect on the cost to the consumer as a price increase of 2.98 cents or a 2.31 cubic inch decrease in the volume of gasoline delivered.

### Industry Knowledge of the Impact of Motor Fuel Temperature Variations

48.     Refiners and marketers of motor fuel products have long been aware of the volume-variable properties of motor fuel resulting from changes in the temperature of motor fuel.

49.     In the early 1900's, the Rockefeller family business, the Standard Oil Trust, experienced difficulties in accounting for inventory credits provided to business partners owning wellheads because of the volume variations of petroleum distillates associated with their temperature variations during the delivery and storage processes. Because of the inherent unreliability of measuring quantities of petroleum distillates by volumetric measure alone and the resulting non-uniformity in commercial transactions for petroleum distillates, the Standard Oil Trust funded research by The American Petroleum Institute to analyze the problem and to create an appropriate standardized unit of measurement for use in the sale of petroleum products.

50.     The American Petroleum Institute turned to the National Bureau of Standards (the Bureau) for assistance in creating such a standard.

### The Development of the Industry Standard "Gallon"

51.     The Bureau's work resulted in the creation of a petroleum industry standard now known as ASTM-IP D 1250.

8

52.    ASTM-IP D 1250 defines a standard unit of measurement for a U.S. petroleum gallon as 231 cubic inches at 60 degrees Fahrenheit.

53.    The inclusion of a temperature component in the definition of "gallon" ensured that the amount of fuel contained in every defined "gallon" was exactly the same amount.

54.    The defined "gallon" thereby enabled all parties to a motor fuel transaction to measure accurately the amount of motor fuel changing hands in a transaction, notwithstanding the variations in the volume of the fuel resulting from temperature changes.

55.    Thus, the industry has adopted as the standard unit of measurement of a "gallon" of petroleum product as 231 cubic inches at 60 degrees Fahrenheit in order to bring certainty and predictability to petroleum transactions.

56.    That industry standard has been adopted throughout the United States petroleum industry and various government agencies, including:

    a.    The United States Department of Treasury, through its Bureau of Customs, which requires imported petroleum products to be declared in gallons of 231 cubic inches at 60 degrees Fahrenheit;

    b.    The American Petroleum Institute, which has adopted the definition as a recommended industry standard, API 2540, also called D-1250;

    c.    The American Society for Testing and Materials, which has adopted D-1250 as the recommended industry standard;

    d.    The American National Standards Institute, which has adopted as the recommended industry standard, ANSI 711.83 which is D-1250; and

e.     The Federal Trade Commission, which has adopted as a mandatory standard relating to packaged petroleum products the definition of a gallon of 231 cubic inches at 60 degrees Fahrenheit, 16 CFR, 500.8 (B).

57.     Despite the industry-wide adoption of this standardized definition of a "gallon," the Defendants have and continue to use the non-standard, non-temperature-adjusted definition of a "gallon" in their measurement of the motor fuel they delivered and continue to deliver to Plaintiffs and class members.

### The Petroleum Industry Profits from the Sale of Hot Motor Fuel to Consumers

58.     Due to the temperature-sensitive properties of motor fuel, there are more non-temperature-adjusted "gallons" of motor fuel in a warmer batch of motor fuel than the number of non-temperature-adjusted gallons there are in a cooler batch of motor fuel.  In other words, by not correcting for temperature, sellers of motor fuel get to sell "more" fuel, and reap higher profits, simply by selling motor fuel that is higher than 60 degrees Fahrenheit and that is not adjusted (either by price or by volume) back to the standard, i.e., 60 degree, gallon.

59.     Expressed in terms of their respective energy content, there are fewer BTU in a non-temperature-adjusted "gallon" of motor fuel at any given temperature than the number of BTU in the same non-temperature adjusted "gallon" of motor fuel at a lower temperature.

60.     Consequently, in sales of motor fuel measured in non-standard, non-temperature-adjusted "gallons," a seller can sell more "gallons" of motor fuel at a warmer temperature than at a cooler temperature and thus can reap higher profits, simply by selling motor fuel that is warmer than 60 degrees Fahrenheit and that is not adjusted (either by price or by volume) back to a standard, i.e., a 60 degree, gallon.  These temperature-inflated profits arise from being able to

make more sales out of the same amount of motor fuel purely because of the increased temperature of the fuel.

61.    The average temperature of motor fuel sold annually in the United States and in the states at issue in this action exceeds 60 degrees Fahrenheit.

62.    Because the average temperature of motor fuel sold annually in the United States, and in each of the states where Plaintiffs purchased, exceeds 60 degrees Fahrenheit, each year the petroleum industry delivers to consumers substantially smaller quantities of motor fuel per non-standard "gallon" than the industry would deliver if it measured deliveries of motor fuel to consumers by the industry standard "gallon" of 231 cubic inches of motor fuel at 60 degrees Fahrenheit.

63.    As a result, consumers in the United States collectively spend billions of dollars more each year to purchase the same quantity of motor fuel they would have received at advertised prices "per gallon" if the industry measured deliveries of motor fuel to consumers by the industry standard "gallon" of 231 cubic inches of motor fuel at 60 degrees Fahrenheit.  The sellers of "hot" motor fuel are able to pocket these billions of additional dollars in temperature-inflated profits merely because the fuel they are selling is warmer than 60 degrees Fahrenheit.

### The Petroleum Industry Opposes Temperature Compensation in the U.S.

64.    Because the petroleum industry profits from the sale of hot motor fuel to U.S. consumers, it has resisted all efforts to change its practice of measuring deliveries of motor fuel to retail customers in non-standard, non-temperature-adjusted "gallons."

65.    The technology for temperature compensation equipment has been available for years to ensure that every gallon of motor fuel consumers purchase contains the same quantity of

11

motor fuel regardless of its temperature. For example, the State of California has recently issued a "certificate of use" for one manufacturer's temperature compensation fuel dispensing pump.

66.    Temperature compensation equipment automatically adjusts each pumped gallon of motor fuel to provide a volume greater than 231 cubic inches when the temperature of the fuel exceeds 60 degrees Fahrenheit. The exact amount of the increased volume corresponds directly to the amount by which the actual temperature of the fuel exceeds 60 degrees Fahrenheit.

67.    Conversely, temperature compensation equipment automatically adjusts each pumped gallon of motor fuel to provide a volume less than 231 cubic inches when the temperature of the fuel is less than 60 degrees Fahrenheit. The exact amount of the decreased volume corresponds directly to the amount by which the actual temperature of the fuel is lower than 60 degrees Fahrenheit.

68.    Because the petroleum industry profits from the sale of hot motor fuel to consumers at non-standard, non-temperature-adjusted "gallons," however, the industry has repeatedly fought efforts to require the installation of temperature compensation equipment at retail fuel pumps in the United States.

69.    When acting as retail sellers of motor fuel, the Defendants have refused to install temperature compensation equipment at their retail outlets and on information and belief, have pressured manufacturers of compensation equipment not to market such equipment. When acting as franchisors, the Defendants control the specifications of the motor fuel dispensing devices at their franchisees' retail locations and prohibit their franchisees from installing temperature compensation equipment.

### *The Petroleum Industry Embraces Temperature Compensation in Canada*

70.    The average temperature of motor fuel sold annually in Canada is less than 60 degrees Fahrenheit.

71.    Consequently, if the petroleum industry were to measure its deliveries of motor fuel to Canadian consumers by the same non-standard "gallon" it uses to measure its delivery of motor fuel to U.S. consumers, the industry would deliver to Canadian consumers substantially larger quantities of motor fuel per non-standard "gallon" than by measuring deliveries of motor fuel by the industry standard "gallon" of 231 cubic inches of motor fuel at 60 degrees Fahrenheit.  In Canada, the use of the same non-standard "gallon" used in the U.S. would benefit Canadian consumers and substantially diminish industry profits.

72.    Accordingly, in Canada the petroleum industry has voluntarily implemented use of the industry standard "gallon" in retail sales through the voluntary and widespread use of temperature compensation equipment at retail pumps.

73.    The petroleum industry has also supported legislation in Canada requiring the installation of temperature compensation equipment at retail pumps.

74.    The petroleum industry's position on temperature compensation equipment thus depends on whether the absence of the equipment allows it to earn greater profits or causes it to earn reduced profits.  Where the sales of hot motor fuel, as in the United States, allow the petroleum industry to earn even higher profits, the industry opposes the installation of such equipment as being too costly.  Where the sales of cold motor fuel, as in Canada, reduce industry profits, the industry supports the use of such equipment.

### Consumers and Competition

75.    The industry-wide practice of selling non-standard, non-temperature-adjusted motor fuel at the retail level, pressuring manufacturers of temperature compensation equipment not to

market such equipment, and prohibiting franchisees from installing such equipment, have additional anti-competitive effects that harm consumers, including Plaintiffs and class members, and benefit retailers, including Defendants.

76.     The temperature at which Defendants sell gas varies significantly from retailer to retailer.  Because U.S. (but not Canadian) retailers refuse to install widely available temperature-compensation equipment, the amount of motor fuel that a consumer actually obtains at a given price varies from retailer to retailer and from purchase to purchase.

77.     Defendants' refusal to sell standardized, temperature-adjusted motor fuel at the retail level obscures the true price of motor fuel and raises the costs that consumers must incur to ascertain the true quantity, and thus the true price-per-gallon, of the motor fuel they purchase.  In other words, variation in the temperature at which non-standardized quantities of motor fuel are delivered makes the actual price of motor fuel less observable and increases consumers' search costs.

78.     Some retailers provide temperature information on demand, but obtaining such information is time consuming.  The opportunity costs of requesting, and obtaining, such information can be significant.

79.     Defendants' refusal to sell standardized, temperature-adjusted motor fuel at the retail level, or to report the temperature at which a given batch of motor fuel is delivered, prevents consumers from accurately making even rudimentary price comparisons in determining where to purchase motor fuel.

80.     The opacity of prices in the retail motor fuel market gives retailers unfair power over price and impairs the basic competitive processes that work to maximize consumer benefit in a market economy.  Undisclosed variation in the quantities of motor fuel delivered to consumers

allows retailers that deliver less product at a given price to earn greater profits than retailers that deliver more product at the same price. By extension, retailers that deliver less consumer benefit are more likely than retailers that deliver more consumer benefit to survive market competition.

81.    Defendants' refusal to sell standardized, temperature-adjusted motor fuel also creates perverse incentives for motor fuel retailers. The current means by which motor fuel is delivered at the retail (but not wholesale) level creates incentives for retailers to transport, store and deliver motor fuel to consumers in a way that maximizes the motor fuel's temperature. At worst, the current means of delivering motor fuel at the retail (but not the wholesale) level creates incentives for retailers to affirmatively heat motor fuel to earn a competitive edge vis-à-vis competitors. These incentives have the effect of widening the variation in the temperature at which motor fuel is delivered at the retail level and impairing market competition by further obscuring the true price of motor fuel.

82.    Motor fuel retailers sell a variety of fuel products that vary by octane levels and other aspects of the fuel's chemical make-up. This variation maximizes consumer choice and is at the heart of efforts by Defendants to market and sell motor fuel "brands."

83.    Many consumers track the fuel economy of their vehicles, both to ensure that their vehicles remain in proper working order, and to determine which "brand" of motor fuel delivers optimal performance.

84.    The variation in the actual amounts of motor fuel delivered introduces substantial uncertainty into consumers' efforts to gauge the performance of their vehicles, leading to sub-optimal choice of motor fuel "brand."

85.    Because consumers cannot make fully informed decisions about which "brand" of motor fuel delivers optimal performance, Defendants' refusal to sell standardized, temperature-

adjusted motor fuel at the retail level foils consumer choice and thus impairs basic market competition.

## CLASS ACTION ALLEGATIONS

86.    Plaintiffs bring this action on behalf of all persons who purchased motor fuel at a temperature greater than 60 degrees Fahrenheit from one or more of the Defendants in the States of Alabama, Arizona, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas and Virginia.  Excluded from the class are all officers and directors of the Defendants, their parents, subsidiaries and affiliates, any law firm or attorney of record in this matter and any judge who presides over this case.

87.    The class is so numerous that joinder of all members is impracticable. While the exact number of class members is unknown, Plaintiffs believe that the proposed class would include millions of customers.

88.    There are questions of fact and law common to all class members, including:

   a.    Whether the Defendants routinely sell motor fuel to consumers at temperatures substantially above 60 degrees Fahrenheit;

   b.    Whether "gallon" as that term is used in the retail sale of motor fuel is a standard unit of measure which has a recognized and permanent value, such that the amount of motor fuel in one gallon does not vary and is always the same in every gallon;

   c.    Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" is an unfair practice;

d.     Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" is a fraudulent practice;

e.     Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" is a deceptive practice;

f.     Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" is an unlawful practice;

g.     Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" is an unconscionable practice;

h.     Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" has harmed Plaintiffs and class members;

i.     Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" should be enjoined;

j.     Whether the Defendants should be required to make Plaintiffs and class members whole for any harm caused by the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a non-standard, non-temperature-adjusted "gallon" and, if so, in what amount.

89.    The common questions of fact or law are central to the adjudication of this action and predominate over any issues affecting only individual members.

90.    Plaintiffs' claims are typical of the claims of the class because Plaintiffs are members of the proposed class, their claims have the same essential characteristics as the claims of class members, their claims arise from the same general course of conduct that gives rise to claims of all class members, and their claims are based on the same legal theories as those of all other class members.

91.    A trial of this matter will therefore be manageable if it is certified as a class action.

92.    Plaintiffs will fairly and adequately protect the interests of the members of the class.

93.    Plaintiffs will adequately represent the plaintiff class because they have no interest that is adverse or antagonistic to the interests of absent class members.

94.    Plaintiffs have retained counsel who have substantial experience and success in the prosecution of complex class action and consumer-protection litigation.

95.    The expense of prosecuting Plaintiffs and class members' claims individually would significantly exceed any economic benefit Plaintiffs or class members could realize individually, thus making individual litigation of their claims economically impractical and infeasible. Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

96.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the Defendants.

97.    The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## CAUSES OF ACTION

### Count One
### (Violation of the Arizona Consumer Fraud Act)

98.    Plaintiffs reallege and incorporate all preceding paragraphs of this Complaint (hereafter, the "General Allegations") as the first paragraph of this Count One.

99.    Plaintiffs bring this Count on behalf of all persons who purchased hot motor fuel from any of the Defendants in the State of Arizona.

100.    Motor fuel is merchandise under the Arizona Consumer Fraud Act.

101.    The Defendants violated and continue to violate the Arizona Consumer Fraud Act by engaging in the following deceptive acts or practices in connection with the sale or advertisement of hot motor fuel:

a.    Delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

b.    Representing to Plaintiffs and class members motor fuel unit prices in terms of the standard unit of a "gallon," when in fact Defendants deliver non-standard "gallons" of motor fuel measured volumetrically without reference to temperature;

c.    Delivering to Plaintiffs and class members less motor fuel than Defendants agreed to deliver when the temperature of the motor fuel exceeded 60 degrees Fahrenheit.

102.    The Defendants violated and continue to violate the Arizona Consumer Fraud Act by engaging in the following deceptive concealment, suppression and omission of material facts in connection with the sale or advertisement of hot motor fuel:

      a.    Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

      b.    Concealing, suppressing and omitting that the standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit;

      c.    Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon;

      d.    Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less energy than the standard U.S. Petroleum Gallon;

      e.    Concealing, suppressing and omitting that the energy content of motor fuel sold by the Defendants varies according to its temperature;

      f.    Concealing, suppressing and omitting that the term "gallon" used by the Defendants in the sale of motor fuel to consumers at the retail level of distribution is not a standard unit of measure.

103.    The Defendants intended to do the aforementioned acts and intended that Plaintiffs and class members would rely on the Defendants' concealments, suppressions or omissions in the purchase of hot motor fuel.

104.   Plaintiffs and class members relied on Defendants' deceptive acts or practices in connection with Plaintiffs' and class members' purchases of hot motor fuel and that reliance caused them to sustain actual damages.

105.   Plaintiffs and class members sustained consequent and proximate actual damages as a result of their reliance on Defendants' deceptive acts or practices because they received less motor fuel than they were entitled to receive and for which they paid.

106.   Defendants' sale of hot motor fuel and their deceptive acts and practices in connection therewith was and is reckless, shows spite or ill will or demonstrates a reckless indifference to the interests of Plaintiffs and class members.

107.   Defendants' conduct has further injured Plaintiffs and class members by impairing competition within retail motor fuel markets and preventing Plaintiffs and class members from making fully informed decisions about the motor fuel they purchase.

WHEREFORE, Plaintiffs respectfully request that this Court enjoin Defendants from engaging in the unlawful conduct alleged herein; require the Defendants to install temperature correcting equipment on their retail motor fuel dispensing devices or require Defendants to post conspicuous notice on their retail motor fuel dispensing devices notifying consumers of the temperature at which the motor fuel is being sold and the effect of temperature on the energy content of motor fuel; require Defendants to notify all affected persons of the Court's injunction; declare that selling motor fuel in non-standard gallons or at temperatures above 60 degrees Fahrenheit without volume adjustment violates the Arizona Consumer Fraud Act; award monetary damages incidental to the requested injunctive or declaratory relief; award Plaintiffs and/or class members a reasonable attorneys' fee and award such other relief as the Court may deem just and proper.

**Count Two**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

108.    Plaintiffs reallege and incorporate the General Allegations as the first paragraph of this Count Two.

109.    Plaintiffs bring this Count on behalf of all persons who purchased hot motor fuel from any of the Defendants in the State of Florida.

110.    Plaintiffs are consumers under the Florida Deceptive and Unfair Trade Practices Act.

111.    The advertising and sale of motor fuel is trade or commerce under the Florida Deceptive and Unfair Trade Practices Act.

112.    The Defendants violated and continue to violate the Florida Deceptive and Unfair Trade Practices Act by engaging in the following unconscionable acts or practices and unfair or deceptive acts or practices in the sale of hot motor fuel, all of which were likely to mislead or deceive Plaintiffs and class members acting reasonably in the same circumstances:

    a.    Delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

    b.    Representing to Plaintiffs and class members motor fuel unit prices in terms of the standard unit of a "gallon," when in fact Defendants deliver non-standard "gallons" of motor fuel measured volumetrically without reference to temperature;

    c.    Delivering to Plaintiffs and class members less motor fuel than Defendants agreed to deliver when the temperature of the motor fuel exceeded 60 degrees Fahrenheit;

    d.    Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

e.    Concealing, suppressing and omitting that the standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit;

f.    Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon;

g.    Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less energy than the standard U.S. Petroleum Gallon;

h.    Concealing, suppressing and omitting that the energy content of motor fuel sold by the Defendants varies according to its temperature;

i.    Concealing, suppressing and omitting that the term gallon used by the Defendants in the sale of motor fuel to consumers at the retail level of distribution is not a standard unit of measure.

113.    Plaintiffs and class members were aggrieved by and sustained actual damages as a result of the Defendants' conduct because they received less motor fuel than they were entitled to receive and for which they paid.

114.    Defendants' conduct has further injured Plaintiffs and class members by impairing competition within retail motor fuel markets and preventing Plaintiffs and class members from making fully informed decisions about the motor fuel they purchase.

WHEREFORE, Plaintiffs respectfully request that this Court enjoin Defendants from engaging in the unlawful conduct alleged herein; require the Defendants to install temperature correcting equipment on their retail motor fuel dispensing devices or require Defendants to post

conspicuous notice on their retail motor fuel dispensing devices notifying consumers of the temperature at which the motor fuel is being sold and the effect of temperature on the energy content of motor fuel; require Defendants to notify all affected persons of the Court's injunction; declare that selling motor fuel in non-standard gallons or at temperatures above 60 degrees Fahrenheit without volume adjustment violates the Florida Deceptive and Unfair Trade Practices Act; award monetary damages incidental to the requested injunctive or declaratory relief; award Plaintiffs and/or class members a reasonable attorneys' fee and award such other relief as the Court may deem just and proper.

## Count Three
## (Violation of the North Carolina Unfair and Deceptive Trade Practices Act)

115.    Plaintiffs reallege and incorporate the General Allegations as the first paragraph of this Count Three.

116.    Plaintiffs bring this Count on behalf of all persons who purchased hot motor fuel from any of the Defendants in the State of North Carolina.

117.    The Defendants violated and continue to violate the North Carolina Unfair and Deceptive Trade Practices Act by engaging in the following unfair or deceptive acts or practices in the sale of hot motor fuel, all of which had the capacity to deceive Plaintiffs and class members:

      a.    Delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

      b.    Representing to Plaintiffs and class members motor fuel unit prices in terms of the standard unit of a "gallon," when in fact Defendants deliver non-standard "gallons" of motor fuel measured volumetrically without reference to temperature;

24

c.    Delivering to Plaintiffs and class members less motor fuel than Defendants agreed to deliver when the temperature of the motor fuel exceeded 60 degrees Fahrenheit;

d.    Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

e.    Concealing, suppressing and omitting that the standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit;

f.    Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon;

g.    Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less energy than the standard U.S. Petroleum Gallon;

h.    Concealing, suppressing and omitting that the energy content of motor fuel sold by the Defendants varies according to its temperature;

i.    Concealing, suppressing and omitting that the term gallon used by the Defendants in the sale of motor fuel to consumers at the retail level of distribution is not a standard unit of measure.

118.    Plaintiffs and class members sustained actual damages as a result of the Defendants' conduct because they received less motor fuel than they were entitled to receive and for which they paid.

119.   Defendants' conduct has further injured Plaintiffs and class members by impairing competition within retail motor fuel markets and preventing Plaintiffs and class members from making fully informed decisions about the motor fuel they purchase.

WHEREFORE, Plaintiffs respectfully request that this Court enjoin Defendants from engaging in the unlawful conduct alleged herein; require the Defendants to install temperature correcting equipment on their retail motor fuel dispensing devices or require Defendants to post conspicuous notice on their retail motor fuel dispensing devices notifying consumers of the temperature at which the motor fuel is being sold and the effect of temperature on the energy content of motor fuel; require Defendants to notify all affected persons of the Court's injunction; declare that selling motor fuel in non-standard gallons or at temperatures above 60 degrees Fahrenheit without volume adjustment violates the North Carolina Unfair and Deceptive Trade Practices Act; award monetary damages incidental to the requested injunctive or declaratory relief; award Plaintiffs and/or class members a reasonable attorneys' fee and award such other relief as the Court may deem just and proper.

**Count Four**
**(Violation of the Texas Deceptive Trade Practices-Consumer Protection Act)**

120.   Plaintiffs reallege and incorporate the General Allegations as the first paragraph of this Count Four.

121.   Plaintiffs bring this Count on behalf of all persons who purchased hot motor fuel from any of the Defendants in the State of Texas.

122.   Motor fuel is a good under the Texas Deceptive Trade Practices-Consumer Protection Act.

123.   Plaintiffs are consumers under the Texas Deceptive Trade Practices-Consumer Protection Act.

26

124.    The advertising, offering for sale and sale of motor fuel is trade or commerce under the Texas Deceptive Trade Practices-Consumer Protection Act.

125.    The Defendants violated and continue to violate the Texas Deceptive Trade Practices-Consumer Protection Act by engaging in the following unconscionable, false, misleading or deceptive acts or practices in connection with the sale or advertisement of hot motor fuel, all of which were false or had the capacity to deceive:

   a.    Delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

   b.    Representing to Plaintiffs and class members motor fuel unit prices in terms of the standard unit of a "gallon," when in fact Defendants deliver non-standard "gallons" of motor fuel measured volumetrically without reference to temperature;

   c.    Delivering to Plaintiffs and class members less motor fuel than Defendants agreed to deliver when the temperature of the motor fuel exceeded 60 degrees Fahrenheit;

   d.    Representing that hot motor fuel has characteristics, uses, benefits, or quantities which it does not have.

126.    The Defendants violated and continue to violate the Texas Deceptive Trade Practices-Consumer Protection Act by engaging in the following unconscionable, false, misleading or deceptive acts or practices in connection with the sale or advertisement of hot motor fuel, all of which had the capacity to deceive:

   a.    Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

27

b.    Concealing, suppressing and omitting that the standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit;

c.    Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon;

d.    Concealing, suppressing and omitting that the energy content of motor fuel sold by the Defendants varies according to its temperature;

e.    Concealing, suppressing and omitting that the term "gallon" used by the Defendants in the sale of motor fuel to consumers at the retail level of distribution is not a standard unit of measure;

f.    Failing to disclose information concerning motor fuel, as stated above, which was known at the time of the transaction where such failure to disclose such information was intended to induce Plaintiffs and class members into retail sale transactions into which Plaintiffs and class members would not have entered had the information been disclosed.

127.    The Defendants intended that Plaintiffs and class members would rely on the Defendants' concealments, suppressions or omissions in the purchase of hot motor fuel.

128.    Plaintiffs and class members relied on Defendants' false, misleading or deceptive acts or practices.

129.    The Defendants, by engaging in the foregoing conduct, took advantage of Plaintiffs' and class members' lack of knowledge, ability, experience or capacity to a grossly unfair degree.

130.    Plaintiffs and class members sustained actual damages, the producing cause of which was the Defendants' unconscionable or deceptive acts or practices, because they received less fuel motor fuel than they were entitled to receive and for which they paid.

131.    Defendants' sale of hot motor fuel and their unconscionable and deceptive acts and practices in connection therewith was and is reckless, shows spite or ill will or demonstrates a reckless indifference to the interests of consumers.

132.    Defendants' conduct has further injured Plaintiffs and class members by impairing competition within retail motor fuel markets and preventing Plaintiffs and class members from making fully informed decisions about the motor fuel they purchase.

133.    Plaintiffs provided written notice to all Defendants pursuant to V.T.C.A. Bus. & C. § 17.505 more than 60 days before filing this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enjoin Defendants from engaging in the unlawful conduct alleged herein; require the Defendants to install temperature correcting equipment on their retail motor fuel dispensing devices or require Defendants to post conspicuous notice on their retail motor fuel dispensing devices notifying consumers of the temperature at which the motor fuel is being sold and the effect of temperature on the energy content of motor fuel; require Defendants to notify all affected persons of the Court's injunction; declare that selling motor fuel in non-standard gallons or at temperatures above 60 degrees Fahrenheit without volume adjustment violates the Texas Deceptive Trade Practices-Consumer Protection Act; award monetary damages incidental to the requested injunctive or declaratory relief; and award Plaintiffs and/or class members a reasonable attorneys' fee and award such other relief as the Court may deem just and proper.

**Count Five**
**(Violation of the Virginia Consumer Protection Act of 1977)**

134.    Plaintiffs reallege and incorporate the General Allegations as the first paragraph of this Count Five.

135.    Plaintiffs bring this Count on behalf of all persons who purchased hot motor fuel from any of the Defendants in the State of Virginia.

136.    The Defendants are suppliers of motor fuel under the Virginia Consumer Protection Act of 1977.

137.    Motor fuel is a good under the Virginia Consumer Protection Act of 1977.

138.    The advertisement, sale or offering for sale of motor fuel to be used primarily for personal, family or household purposes is a consumer transaction under the Virginia Consumer Protection Act of 1977.

139.    The Defendants violated and continue to violate the Virginia Consumer Protection Act of 1977 using the following deception, fraud, false pretense, false promise or misrepresentation in connection with advertisement, offering for sale and sale of hot motor fuel:

   a.    Delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

   b.    Representing to Plaintiffs and class members motor fuel unit prices in terms of the standard unit of a "gallon," when in fact Defendants deliver non-standard "gallons" of motor fuel measured volumetrically without reference to temperature;

   c.    Delivering to Plaintiffs and class members less motor fuel than Defendants agreed to deliver when the temperature of the motor fuel exceeded 60 degrees Fahrenheit;

d.   Misrepresenting that hot motor fuel has quantities, characteristics uses or benefits that it does not have;

e.   Misrepresenting that hot motor fuel is of a particular quality that it is not;

f.   Advertising hot motor fuel with intent not to sell it as advertised, or with intent not to sell at the price or upon the terms advertised;

g.   Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

h.   Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

i.   Concealing, suppressing and omitting that the standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit;

j.   Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon;

k.   Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less energy than the standard U.S. Petroleum Gallon;

l.   Concealing, suppressing and omitting that the energy content of motor fuel sold by the Defendants varies according to its temperature;

m.   Concealing, suppressing and omitting that the term gallon used by the Defendants in the sale of motor fuel to consumers at the retail level of distribution is not a standard unit of measure.

140.     The Defendants knew their representations and omissions in connection with the advertisement, offering for sale and sale of hot motor fuel were false and made with the intent to deceive Plaintiffs and class members.

141.     The Defendants intended that Plaintiffs and class members would rely on the Defendants' concealments, suppressions or omissions in the purchase of hot motor fuel.

142.     Plaintiffs and class members reasonably relied on Defendants' deceptive acts or practices in connection with Plaintiffs and class members' purchases of hot motor fuel.

143.     Plaintiffs and class members sustained actual damages as a result of their reliance on Defendants' deceptive acts or practices because they received less motor fuel than they were entitled to receive and for which they paid.

144.     Defendants' conduct has further injured Plaintiffs and class members by impairing competition within retail motor fuel markets and preventing Plaintiffs and class members from making fully informed decisions about the motor fuel they purchase.

WHEREFORE, Plaintiffs respectfully request that this Court enjoin Defendants from engaging in the unlawful conduct alleged herein; require the Defendants to install temperature correcting equipment on their retail motor fuel dispensing devices or require Defendants to post conspicuous notice on their retail motor fuel dispensing devices notifying consumers of the temperature at which the motor fuel is being sold and the effect of temperature on the energy content of motor fuel; require Defendants to notify all affected persons of the Court's injunction; declare that selling motor fuel in non-standard gallons or at temperatures above 60 degrees Fahrenheit without volume adjustment violates the Virginia Consumer Protection Act of 1977; award monetary damages incidental to the requested injunctive or declaratory relief; award

Plaintiffs and/or class members a reasonable attorneys' fee and award such other relief as the Court may deem just and proper.

## Count Six
### (Violation of the Arkansas Deceptive Trade Practices Act)

145.    Plaintiffs reallege and incorporate the General Allegations as the first paragraph of this Count Six.

146.    Plaintiffs bring this Count on behalf of all persons who purchased hot motor fuel from any of the Defendants in the State of Arkansas.

147.    Motor fuel is a good under the Arkansas Deceptive Trade Practices Act.

148.    The Defendants violated and continue to violate the Arkansas Deceptive Trade Practices Act by knowingly engaging in the following unconscionable acts or practices and unfair or deceptive acts or practices in the sale of hot motor fuel, all of which had the capacity to deceive Plaintiffs and class members:

    a.  Delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

    b.  Representing to Plaintiffs and class members motor fuel unit prices in terms of the standard unit of a "gallon," when in fact Defendants deliver non-standard "gallons" of motor fuel measured volumetrically without reference to temperature;

    c.  Delivering to Plaintiffs and class members less motor fuel than Defendants agreed to deliver when the temperature of the motor fuel exceeded 60 degrees Fahrenheit.

149.    The Defendants violated and continue to violate the Arkansas Deceptive Trade Practices Act by knowingly engaging in the following: concealment, suppression, or omission of

material facts in connection with the sale of hot motor fuel with intent that others rely upon the concealment, suppression, or omission, all of which had the capacity to deceive Plaintiffs and class members:

      a.   Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

      b.   Concealing, suppressing and omitting that the standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit;

      c.   Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon;

      d.   Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less energy than the standard U.S. Petroleum Gallon;

      e.   Concealing, suppressing and omitting that the energy content of motor fuel sold by the Defendants varies according to its temperature;

      f.   Concealing, suppressing and omitting that the term "gallon" used by the Defendants in the sale of motor fuel to consumers at the retail level of distribution is not a standard unit of measure.

150.    Plaintiffs and class members sustained actual damages as a result of the Defendants' conduct because they received less motor fuel than they were entitled to receive and for which they paid.

151.    Defendants' conduct has further injured Plaintiffs and class members by impairing competition within retail motor fuel markets and preventing Plaintiffs and class members from making fully informed decisions about the motor fuel they purchase.

WHEREFORE, Plaintiffs respectfully request that this Court enjoin Defendants from engaging in the unlawful conduct alleged herein; require the Defendants to install temperature correcting equipment on their retail motor fuel dispensing devices or require Defendants to post conspicuous notice on their retail motor fuel dispensing devices notifying consumers of the temperature at which the motor fuel is being sold and the effect of temperature on the energy content of motor fuel; require Defendants to notify all affected persons of the Court's injunction; declare that selling motor fuel in non-standard gallons or at temperatures above 60 degrees Fahrenheit without volume adjustment violates the Arkansas Deceptive Trade Practices Act; award monetary damages incidental to the requested injunctive or declaratory relief; award Plaintiffs and/or class members a reasonable attorneys' fee and award such other relief as the Court may deem just and proper.

## Count Seven
### (Breach of Contract)

152.    Plaintiffs reallege and incorporate the General Allegations as the first paragraph of this Count Seven.

153.    Motor fuels are "goods" under applicable commercial law.

154.    Retail transactions for the sale of motor fuel between Defendants-sellers and Plaintiffs-buyers are contracts for the sale of goods under applicable commercial law.

155.    Defendants-sellers are "merchants" and Plaintiffs-buyers and class members are not merchants under applicable commercial law.

156.   Pursuant to applicable commercial law, the "agreement" between Plaintiffs-buyers and Defendants-sellers is the "bargain of the parties in fact, as found in their language or inferred from other circumstances, including . . .  usage of trade…."

157.   Plaintiffs-buyers and class members purchased motor fuel from Defendants-sellers at their retail outlets.

158.   Each time a Plaintiff or a class member contracted to purchase motor fuel from the Defendants, the parties agreed that the Plaintiff or class member would pay a specified price for and that the Defendants would deliver a unit of measure expressed in "gallons."

159.   Because the parties agreed to the sale of motor fuel by a standard unit of measure expressed in gallons, and because in commercial practice a sale of a commodity in terms of a specified price per standard unit of measure has come to mean that such units are fungible (which is to say freely interchangeable), the Plaintiff and class members were, under the circumstances, reasonable in expecting that the Defendants had agreed to deliver fungible gallons of motor fuel such that one unit of the same kind or grade would be freely interchangeable with any other like unit of the same kind or grade of motor fuel.

160.   Consequently, each time a Plaintiff or class member and one of the Defendants made a contract for sale of motor fuel, the parties agreed that the Plaintiff or class member would pay a specified price for and the Defendants would deliver a unit of measure which has a recognized and permanent value, such that the amount of motor fuel contained in that standard unit would not vary and would always contain the same amount of motor fuel.

161.   None of the Plaintiffs' or any class members' agreements with Defendants for the purchase of motor fuel included an express definition of "gallon."

162.    Because a "gallon" defined by volume without reference to temperature is not a standard unit of measure, such a volumetric gallon was not the meaning of a "gallon" intended by the parties in their agreements for the sale of motor fuel at a specified price per gallon.

163.    In other words, the Plaintiffs or any class member could reasonably expect from the language and the circumstances that "gallon" was defined in the agreement with reference to volume and temperature.

164.    In the motor fuel industry, a regularly observed industry standard definition of "gallon" is that amount of motor fuel which occupies 231 cubic inches when its temperature is 60 degrees Fahrenheit.

165.    In other words, the industry standard definition of "gallon" measures the amount of fuel by both volume and temperature and qualifies as a standard unit of measure.

166.    Because of the regularity of observance in the petroleum industry of the industry standard definition of "gallon" and because there is no other standard "gallon" unit commonly used to measure quantities of motor fuel, each time the Plaintiffs and class members agreed to purchase motor fuel at a specified price per gallon, they could reasonably expect that the Defendants agreed to the sale of motor fuel at a specified price per industry standard gallon.

167.    In other words, the Plaintiffs and any class member could reasonably expect that the Defendants would deliver that amount of motor fuel which occupies 231 inches when its temperature is 60 degrees Fahrenheit.

168.    In addition or alternatively, although there was no express definition of "gallon" in the agreement, Plaintiffs and class members could, under the circumstances, reasonably expect that "gallon" meant a standard unit of measure and that meaning excluded any definition of "gallon" that measured by volume but not temperature.

169.    In other words, the industry standard definition of "gallon" qualifies as a standard unit of measure because it measures the amount of motor fuel by both volume and temperature.

170.    Because the agreement does not adjust the price or volume of motor fuel for changes in temperature and motor fuel is sold at a temperature in excess of 60 degrees Fahrenheit, the unadjusted amount of motor fuel delivered at the pump is inconsistent with the standard unit of measure agreed to by the parties.

171.    Because the parties have not agreed on a method of adjusting the price and volume of motor fuel for changes in temperature and such a term is essential to the determination of their rights and duties, the court should supply an adjustment term which is reasonable in the circumstances.

172.    A term which is reasonable in the circumstances is the industry standard definition of "gallon" which measures motor fuel by the volume it occupies when its temperature is 60 degrees Fahrenheit.

173.    Each time Defendants delivered motor fuel to a Plaintiff or a class member, they delivered "gallons" (and/or fractions thereof) of motor fuel as measured volumetrically without reference to temperature.

174.    Each time Defendants delivered motor fuel to a Plaintiff or a class member in "gallons" (and/or fractions thereof) measured volumetrically without reference to temperature, the amount of motor fuel Defendants delivered per "gallon" (and/or fractions thereof) varied depending upon the temperature of the motor fuel.

175.    As a result, each time Defendants delivered motor fuel to Plaintiffs or to a class member when the temperature of the motor fuel was greater than 60 degrees Fahrenheit, Defendants delivered less motor fuel to Plaintiffs and class members than that for which

Plaintiffs or class members paid and were entitled to receive and less motor fuel than Defendants were contractually required to deliver.

176.    Consequently, each time Defendants delivered motor fuel to a Plaintiff or to a class member when the temperature of the motor fuel was greater than 60 degrees Fahrenheit, Defendants breached their contracts for sale of motor fuel with Plaintiffs and class members.

177.    Plaintiffs and class members preformed their obligations under the contracts.

178.    On or around December 13, 2006, each Defendant received notice of breach of contract and breach of express and implied warranty pursuant to UCC 2-607(3) in each state covered by this Complaint for all transactions involving the retail sale of non-temperature adjusted motor fuel (diesel and gasoline), as well as notice that retail customers sustained, and continue to sustain damages by paying extra money for expanded hot fuel which provides no additional energy.

179.    Defendants' breach of contract proximately caused Plaintiffs and class members to sustain substantial losses in an amount to be proved at trial because Plaintiffs and class members received less motor fuel and less energy than they were entitled to receive under the sale contracts.

39

Wherefore, Plaintiffs and class members pray for the entry of judgment in their favor and against the Defendants for compensatory damages, costs, interest and such other relief as the Court may deem just and proper.

CONNOLLY BOVE LODGE & HUTZ LLP

_____

Collins J. Seitz, Jr. (Bar No. 2237)
Kevin F. Brady (Bar No. 2248)
1007 North Orange Street
P.O. Box 2 207
Wilmington, Delaware 19899-2207
Phone: (302) 658-9141

*Attorneys for Plaintiffs, Kenneth Becker, William Younger, Mark Rushing, William Boyd, Richard Galauski, Frank Owen, Nathan Butler, James Jarvais and Andy Coon, individually and on behalf of others similarly situated*

DATED: March 7, 2007

40

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFF**
KENNETH BECKER, WILLIAM YOUNGER, MARK RUSHING, WILLIAM BOYD, RICHARD GALAUSKI, FRANK OWEN, NATHAN BUTLER, JAMES JARVAIS, and ANDY COON, individually and on behalf of others similarly situated

**(b)** County Of Residence of First Listed Plaintiff     MONTGOMERY COUNTY, TX
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)

Collins J. Seitz, Jr. (Bar No. 2237)
Kevin F. Brady (Bar. No. 2248)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street, P.O. Box 2207
Wilmington, DE 19899      Telephone (302) 658-9141

**DEFENDANTS**
MARATHON PETROLEUM COMPANY, LLC, MURPHY OIL CORPORATION, THE PANTRY, INC., SPEEDWAY SUPERAMERICA, LLC, and WILCO HESS, LLC.

County of Residence of First Listed Defendant:  NEW CASLTE, DE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:     IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION**  (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question
(U.S. Government Not a Party)
☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**  (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**  (Place an "X" In One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL PROPERTY**<br>☒ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br><br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities – Employment<br>☐ 446 Amer. w/Disabilities – Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br><br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA  (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 USC 7609 | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

**V. ORIGIN**  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332 (d)(1).
Brief description of cause:
Consumer class action-Fraud and misrepresentation in the sale of gasoline.

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND: Injunctive relief and damages    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY**    (See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE

**March 7, 2007**

SIGNATURE OF ATTORNEY OF RECORD
*Kevin F. Brady*

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS–44**

Authority For Civil Cover Sheet

The JS–44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. **(a) Plaintiffs – Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below: federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statues unless diversity.**      Example:      U.S. Civil Statute: 47 USC 553
                                                                            Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 0 7 - 1 3 6 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____6_____ COPIES OF AO FORM 85.

_____3/7/07_____

(Date forms issued)

(Signature of Party or their Representative)

Stephen Lennon

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action